IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION
IN ADMIRALTY

THE CONNECTICUT INDEMNITY )
COMPANY, )
                            )        Civil Action No.: 2:04-2522-12
          Plaintiff, )
                            )
-vs- )
                            )
MATTHEW TREANOR, )
                            )
          Defendant, )
-------------------------------------------------- )
                            )
MATTHEW TREANOR, )
                            )
          Third-Party Plaintiff, )
                            )
-vs- )
                            )
CHRISTI INSURANCE GROUP, INC., )
                            )
          Third-Party Defendant. )
-------------------------------------------------- )

## PLAINTIFF THE CONNECTICUT INDEMNITY COMPANY'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT MATTHEW TREANOR'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

Plaintiff The Connecticut Indemnity Company ("Connecticut Indemnity") respectfully submits this Memorandum of Law in Opposition to Defendant Matthew Treanor's Motion for Summary Judgment and in support of its Cross-Motion for Summary Judgment. The undisputed facts establish that misrepresentations of material fact regarding the use of the subject yacht were made in the application for marine insurance coverage to Connecticut Indemnity's underwriter,

which resulted in the procurement of an "all risks" private pleasure use yacht policy that would otherwise not have been issued, for a premium far below what would have been charged, had defendant represented the true use of the yacht. Under the established federal maritime doctrine of utmost good faith ("Uberrimae Fidei"), Connecticut Indemnity is entitled to a declaration that the resulting policy is void ab initio and, therefore, a declaration that it is not liable for the subject claim.

In a continuing pattern of misrepresentation, defendant's brief (Section A) states that the doctrine of breach of warranty was a basis for declining the claim, and that the doctrine is somehow relevant to this action. It was not, and it is not. Defendant raises the breach of warranty doctrine solely to confuse and draw attention away from the true issue, defendant's affirmative misrepresentations in response to questions concerning the use of the yacht.[1]

Connecticut Indemnity also seeks summary judgment on defendant's first counterclaim for bad faith on the grounds that the undisputed evidence establishes that it had reasonable grounds to contest the claim. Thus, as a matter of law, defendant cannot sustain his burden of proving that there was no reasonable basis to support the insurer's decision. Finally, Connecticut Indemnity seeks summary judgment on each of defendant's third through eighth counterclaims

---

[1] Defendant further misrepresents plaintiff's causes of action. Causes of action one through three arise under the doctrine of uberrimae fidei. The first cause of action is based on defendant's affirmative misrepresentation in response to a specific inquiry regarding charter use when at all times defendant (admittedly) knew that the yacht would be chartered during the policy period, intended to charter the vessel during the policy period, and did in fact charter the vessel during the policy period. Similarly, the second cause of action is based on defendant's affirmative misrepresentation in response to a specific inquiry regarding commercial and/or business use of the yacht. The third cause of action is based on defendant's failure to disclose that the yacht would be used for charter and/or commercial and/or business purposes. Alternatively, in the event that the policy is not found void, plaintiff contends, in causes of action four through six, that certain affirmative misrepresentations and non-disclosures were intentional and in breach of a specific clause in the policy.

on the grounds that no facts exist upon which defendant can sustain his burden of proving the necessary elements of each respective counterclaim.

## FACTUAL BACKGROUND

### A.    The Parties

Since the early 1990's, Marine MGA, Inc. ("Marine MGA"), located in Manchester, New Hampshire, was a managing general agent for certain insurance companies including, but not limited to, Connecticut Indemnity.  (Sterling Aff. ¶ 5).  Pursuant to the contractual agreements in effect between Marine MGA and Connecticut Indemnity, Marine MGA was authorized to quote, bind and issue contracts of insurance, for specific lines of insurance business, on behalf of Connecticut Indemnity, including ocean marine insurance, subject to certain limitations and restrictions, none of which are applicable here.  (Sterling Aff. ¶ 6).  Prior to this contractual relationship, Connecticut Indemnity did not underwrite ocean marine insurance risks.  (Sterling Aff. ¶ 7).  Mr. John Sterling was and is the underwriter at Marine MGA for policies of ocean marine insurance and was the underwriter with respect to the coverage bound on Matthew Treanor's sixty 60' Jim Smith yacht which is the subject of this litigation. (Sterling Aff. ¶ 1).[2]

Third-party defendant Christi Insurance Group, Inc. ("Christi") is an insurance broker that secures insurance, including yacht insurance, on behalf of its clients through various

_____

[2] In 1999, Connecticut Indemnity's parent company, Orion Capital Corp., was purchased by a wholly owned subsidiary of Royal & SunAlliance USA, Inc. (Sterling Aff. ¶ 8).  This technical change in Connecticut Indemnity's ownership did not, in any way, affect the relationship between Connecticut Indemnity and Marine MGA or the manner in which Marine MGA underwrote insurance policies on behalf of Connecticut Indemnity.  (Id.)  To the extent that any other insurance company owned by and/or affiliated with Royal & SunAlliance USA, Inc. also wrote ocean marine insurance, such underwriting was completely separate and distinct from, and was not performed by, Marine MGA. (Id.).

insurance companies. (Ex. 1, McDowell Tr. pp. 24-26, 35-36, 180-82).[3]  Mr. Eric McDowell has

been employed as a producer for Christi for approximately ten (10) years in Christi's Marmora,

New Jersey office. (Ex. 1, McDowell Tr. pp. 5, 24-26).[4]

Defendant Treanor was referred to Mr. McDowell through a Florida yacht broker named

Mr. Wayne Abernathy, who had referred prior business to Mr. McDowell. (Ex. 1 McDowell Tr.

pp. 44-46, 49-50). Over a period of several years, Mr. Abernathy had brokered the purchase

and/or sale of at least six (6) different yachts for defendant Treanor, including the purchase of the

60' Jim Smith. (Ex. 2, Abernathy Tr. pp. 4-6, 31-32, 48-49).

**B.    The Application For Insurance**

On or about September 16, 2003, Marine MGA received a handwritten ACORD

Watercraft Application from Mr. McDowell of Christi. (Sterling Aff. ¶ 9). The application

sought insurance coverage on behalf of Christi's client, defendant Matthew Treanor ("Treanor"),

for a "1980" sixty foot (60') Jim Smith make ocean yacht. (Sterling Aff. ¶ 12). The application

sought hull coverage in the amount of $600,000.00 and protection and indemnity coverage in the

amount of $1 million. (Id.) On the second page of the application, under the heading "General

Information", the application clearly set forth "No" answers to the following two (2) questions:

1.    IS THE BOAT CHARTERED TO OTHERS?

---

[3] References to "Ex. ___, ___" are references to the Exhibits annexed to the Affidavit of Robert
A. Novak, Esq., submitted on behalf of plaintiff Connecticut Indemnity.

[4] Christi's clients include yacht owners, businesses, contractors, retail stores, boat dealers,
boatyards and boat manufacturers. (Ex. 1, McDowell Tr. pp. 24-26, 28-30, 180-182). Christi
obtains most of its clients through referrals from current clients, boat dealers, brokers and finance
companies, and obtains other clients through direct advertising, appearances at boat shows and at
fishing tournaments. (Id.). Christi places policies of marine insurance with numerous insurance
companies and has no obligation to utilize any particular insurance company. (Id.). Christi
decides which insurance companies to approach for a quote based on its expertise in the market.
(Id.).

2. IS THE BOAT USED COMMERCIALLY OR FOR BUSINESS PURPOSES? (Id.)

In reliance on the information set forth in the application, on September 17, 2003, Marine MGA issued a quote for the requested private pleasure use only coverage on the 60' Jim Smith yacht "subject to survey and storm restriction." (Sterling Aff. ¶¶ 14, 15). Thereafter, Marine MGA heard nothing further on this matter until October 3, 2003, when it received a telephone call from Mr. McDowell at Christi requesting a revised quote on the subject yacht, based solely on a reduced hull limit of $525,000.00 with a 2% deductible, with all other information remaining the same. (Sterling Aff. ¶ 16). On that same date, Marine MGA issued a revised quote for private pleasure use "subject to survey". (Sterling Aff. ¶¶ 16, 17).

Thereafter, on October 7, 2003, Christi e-mailed a copy of the yacht's survey to Marine MGA and requested that coverage be bound effective October 7, 2003. (Sterling Aff. ¶ 18). Page seven of the survey report stated "INTENDED USE ... Pleasure" and page 40 of the survey report stated that the vessel was "considered to be 'Fit For Its Intended Service and Suitable For Its Intended Use' of Coastal Recreational Cruising." (Id.) Nothing in the survey report expressed any intent to charter or otherwise use the yacht for commercial or business purposes. (Id.) The survey identified the name of the yacht as "DRAGON SLAYER". (Id.).

On October 8, 2003, after receiving clarification from Christi as to the desired hull limit of $525,000.00, Marine MGA agreed to bind coverage on the yacht for private pleasure use only effective October 7, 2003. (Sterling Aff. ¶ 19).

As is customary in the marine insurance industry, Marine MGA requested that a formal, signed application be submitted by the insured so that coverage would remain in effect and the

actual policy could be issued.[5] (Sterling Aff. ¶ 21). On November 26, 2003, Christi Insurance sent to Marine MGA via telefax and mail a formal application signed by Treanor. (Sterling Aff. ¶ 22). The formal, signed application once again answered "No" to the following questions:

1. IS THIS BOAT CHARTERED TO OTHERS?

2. IS THE BOAT USED COMMERCIALLY OR FOR BUSINESS PURPOSES? (Id.)

Thereafter, on December 4, 2003, Marine MGA, on behalf of Connecticut Indemnity, issued all risk private pleasure yacht policy no. YT 616342 (hereinafter the "Policy"). (Sterling Aff. ¶ 23). The Policy was, in turn, forwarded by Christi to Treanor under a cover letter dated January 13, 2004. (Ex. 1, McDowell Tr. pp. 248-50; Ex. 3, Treanor Tr. pp. 140-41; Ex. 7). Consistent with the representations made to Marine MGA, the Policy clearly and unequivocally contemplated only the private pleasure use of the yacht, stating:

2. **RESTRICTIONS ON THE USE OF YOUR YACHT**: There are certain restrictions on the use of your yacht under this policy. We will not cover losses that occur while your yacht is being used in any way that is prohibited by this policy.

These are the restrictions:

(a) The yacht must be used only for private pleasure purposes. It cannot be chartered, leased or used for any commercial purposes unless approved by us in writing.

(Sterling Aff., Ex. J (10th page)).

---

[5] Three (3) marine insurance brokers deposed in this action have all confirmed that it is the normal practice in the marine insurance industry for the insurance companies to require the submission of formal, signed applications after coverage has been bound in order to issue the policy and keep coverage in effect. These brokers were Christi, Brown & Brown Marine (formerly C.A. Hansen) and Strickland Marine Insurance, Inc. (defendant Treanor's designated expert witness in this action). (Ex. 1, McDowell Tr. pp. 237-39, 259; Ex. 4, Myers Tr. pp. 42-43; Ex. 5, Strickland Tr. pp. 152-57).

## C.    The Claim and Investigation

On June 1, 2004, Christi notified Marine MGA that on May 31, 2004, the yacht sank off the coast of Charleston, South Carolina. (Sterling Aff. ¶ 26). Marine MGA reported the loss to Connecticut Indemnity which assigned Donald Roberts as the adjuster for the claim. (Sterling Aff. ¶ 27; Roberts Aff. ¶¶ 3-5, 8). Mr. Roberts assigned a local surveyor, Capt. Neil Haynes of Blue Water Surveys, to liaison with Treanor and investigate the loss, and subsequently retained Rick Pacheco of North Eastern Technical Services to locate the vessel. (Roberts Aff. ¶¶ 9-11). After waiting for an appropriate weather window, Mr. Pacheco conducted a grid search for the vessel at two (2) separate sets of coordinates but was unsuccessful in locating the vessel. (Roberts Aff ¶ 15). In conducting his own research for purposes of locating the vessel, Mr. Pacheco discovered a website for Palmetto Charters which listed, among several others, a vessel named SQUID ROW, described as a 60' Jim Smith Custom, as being available for half day, ¾ day and full day charters. (Roberts Aff. ¶¶ 14 and 16). Accordingly, questions were raised as to whether Treanor's yacht was being used for charter despite being insured under a policy precluding such use. (Roberts Aff. ¶ 16). Mr. Roberts, therefore, contacted Mr. Sterling and obtained a copy of Marine MGA's underwriting file which contained no mention of charter use. (Roberts Aff. ¶ 17).

On or about July 1, 2004, Connecticut Indemnity, through Blue Water Surveys, retained Ralph Wilbanks to do a side scan sonar search for the vessel. (Roberts Aff. ¶ 18). Gary Weeks of 2-W Diving, Inc. was also retained to supply launch services and to perform a dive to identify the vessel. (Id.). On July 3, 2004, a sunken vessel was located. (Id.). Mr. Weeks dove on the vessel and took one photograph of the transom which revealed a portion of the vessel's name, i.e., "SQUID....", but refused to do anything else other than to tie a small buoy on the vessel.

(Id.). It was learned that Treanor had other vessels named SQUID ROW. (Roberts Aff. ¶ 19). Accordingly, Capt. Haynes was instructed to dive the vessel to confirm that the sunken vessel was in fact the sixty foot (60') Jim Smith. (Id.). Haynes performed the dive on July 20, 2004 and confirmed that the sunken vessel was the Jim Smith. (Id.).

Connecticut Indemnity had an in-house investigator, Tom Pfeiffer, on standby to conduct interviews once Treanor provided the names of the persons aboard the vessel at the time of the sinking. (Roberts Aff. ¶¶ 12, 13 and 20). Treanor finally provided the names and contact information on June 30, 2004 and Mr. Pfeiffer was thereafter instructed to conduct interviews. (Id.). Pfeiffer commenced his interviews with a representative of Palmetto Charters, Jeff Miller, and Captain Jay Swain, who both confirmed that the 60' Jim Smith named "SQUID ROW" was being used for charter, and that Treanor was half owner of a charter business named Palmetto Charters. (Roberts Aff. ¶ 21). Captain Swain further confirmed that he was also the Captain of a prior vessel owned by Treanor (a 53' Ocean yacht) that was also named SQUID ROW and also used for charter. (Id.). That vessel was sold by Treanor at the time he purchased the 60' Jim Smith. (Id.). Captain Swain advised of a third vessel, a 48' Hatteras, also previously owned by Treanor and named the SQUID ROW, which was similarly used for charter. (Id.). Captain Swain also admitted that between the time repairs to the 60' Jim Smith were completed in mid-March, 2004, to the time the yacht sank on May 31, 2004, the yacht was chartered some ten (10) to twelve (12) times with Captain Swain serving as captain on each of the charters. (Id.). Mr. Pfeiffer provided a summary of those interviews to Connecticut Indemnity. (Id.).[6]

While the claim investigation was proceeding, Mr. Roberts had a further discussion with John Sterling, who confirmed to Mr. Roberts that no charter or commercial or business use of the

yacht was ever disclosed to Marine MGA at any time and that representations were expressly made to the contrary. (Roberts Aff. ¶ 22; Sterling Aff. ¶ 29). Also in that discussion, Mr. Sterling confirmed that the representations of no charter and/or commercial and/or business use were material to Mr. Sterling both with respect to the actual policy language under which he would be willing to insure the yacht and with respect to the amount of premium. (Roberts Aff. ¶ 23; Sterling Aff. ¶30).

Based upon all of the above information, Connecticut Indemnity obtained a legal opinion as to its rights with respect to the yacht policy and Mr. Treanor's claim. (Roberts Aff. ¶ 24). Thereafter, Connecticut Indemnity made the decision to deny Mr. Treanor's claim, and issued a declination letter on July 28, 2004. (Roberts Aff. ¶ 25). Contemporaneously with the declination of the claim, Connecticut Indemnity commenced the instant declaratory judgment action [Docket No. 1]. (Id.).

In answer to the declaratory judgment complaint, Treanor has admitted to the following:

> 35. Responding to the allegations of paragraph 47, Defendant admits that at all times during the application for the subject insurance coverage and prior to the binding of such coverage, Defendant knew that the vessel would be used for charter during the policy period of coverage and/or intended to use the vessel for charter during the policy period of coverage; Defendant denies the remaining allegations of paragraph 47 and demands strict proof thereof.

> 36. Responding to the allegations of paragraph 48, Defendant admits that between October 7, 2003 and the date of the alleged sinking, the subject vessel was chartered on occasions; Defendant denies the remaining allegations of paragraph 48 and demands strict proof thereof.

---

[6] At his deposition, Captain Swain testified that the investigator's summary accurately reflected the information provided by Captain Swain to the investigator. (Ex. 6, Swain Tr. pp. 67-69).

(Docket No. 5). (See same admissions at ¶¶ 26 and 27 of Docket No. 5). Thus, Treanor admits that at all times, he knew that the yacht would be used, and in fact did use the yacht, for chartering.

## D.     Additional Facts Learned During Discovery

Discovery has revealed that Treanor was not only a principal in Palmetto Charters and Yacht Services, L.L.C., but that he also incorporated Squid Row Charter Services, Inc. in Georgia in 2000, and further incorporated Squid Row Charters LLC in Delaware in 2001 to run sport fishing charters. (Ex. 3, Treanor Tr. pp. 12-18, 30-34). The application for a Tax Identification No. for Squid Row Charters LLC referenced the new business as a "charter service" and listed the principal activity of the company as "boat charter." (Ex. 3, Treanor Tr. pp. 18-20).

It was also revealed that Squid Row Charters maintained a web site advertising the previous "SQUID ROW", the 53' Ocean, as being available for charter on a year round basis. (Ex. 3, Treanor Tr. pp. 25-28; Ex. 8).[7] Similarly, it was revealed that Palmetto Charters maintained a web site advertising numerous vessels as being available year-round for charter. The original Palmetto Charters' web site referenced the 53' Ocean "SQUID ROW" with Captain Jay Swain. (Ex. 3, Treanor Tr. pp. 34-36; Ex. 9). Palmetto Charters' updated web site referenced the 60' Jim Smith "SQUID ROW" with Captain Jay Swain as being available for year-round charter. (Ex. 3, Treanor Tr. pp. 161-62; Ex. 10 at p. 3).

In addition, Treanor produced copies of numerous "Charter Confirmations" on the letterhead of Palmetto Charters relating to the 60' Jim Smith. (Ex. 3, Treanor Tr. pp. 184-193;

---

[7] Capt. Swain testified that after he became Captain of the 53' Ocean SQUID ROW in April/May 2003, he ran approximately thirty (30) charters with the yacht until it was sold in September of 2003. (Ex. 6, Swain Tr. pp. 21-23, 26).

Ex. 11). Treanor also produced a "2005 Saltwater Charter Vessel Permit Renewal" from the South Carolina Department of Natural Resources for the 60' Jim Smith which stated "IS VESSEL USED FOR COMMERCIAL FISHING: YES", and which was signed by Treanor under a declaration of truth. (Ex. 3, Treanor Tr. pp. 195-96; Ex. 12).

Discovery has further revealed that Treanor was no novice in the buying, selling, chartering and insuring of yachts. At least since the year 2000, Treanor utilized the services of another marine insurance broker, Brown & Brown Marine (formerly C.A. Hansen) to obtain insurance on several vessels. (Ex. 4, Myers Tr. p. 32). Treanor, through C.A. Hansen, insured the 1988 48' Hatteras named SQUID ROW under a yacht policy issued by ACE/INAMAR. (Ex. 4, Myers Tr. pp. 33-36; Ex. 3, Treanor Tr. pp. 39-41). That policy was endorsed to allow "occasional charters." (Ex. 13). Mr. McDowell testified that the ACE/INAMAR "Occasional Charter Endorsement" allowed up to 55 charters per policy year.[8] (Ex. 1, McDowell Tr. p. 196; Ex. 4, Myers. Tr. p. 99).

During March, 2001, Treanor purchased a 61' Hatteras named "KORINA VICTORIA." A C.A. Hansen memo to Treanor stated that "[w]e want to put this vessel with the same company that writes 'Squid Row' to get the charter coverage you want", but the yacht was quickly sold by Treanor prior to being insured. (Ex. 3, Treanor Tr. pp. 43-46; Ex. 4, Myers Tr. pp. 52-53; Ex. 14).

---

[8] The ACE/INAMAR yacht policy does not allow charters unless endorsed. The "Occasional Charter Endorsement" to the ACE/INAMAR "Yachtsman/Windjammer/Boatsman Policy" required a substantial increase in premium. According to Mr. McDowell, ACE/INAMAR accounted for the additional risk posed from "occasional" chartering by doubling the "P&I" premium for the policy. (Ex. 1, McDowell Tr. pp. 194-97). If an insured required more charters than allowed through the "Occasional Charter Endorsement", ACE/INAMAR utilized a separate "Charter Policy" with an additional premium associated therewith. (Ex. 4, Myers Tr. pp. 25-32).

In March, 2000, Treanor also purchased and sought insurance coverage on a 50' AZIMUT yacht on which he did not want charter coverage. (Ex. 3, Treanor Tr. pp. 46-51). Treanor's signed application and the subsequent Confirmation of Insurance for that vessel clearly indicated the use of that yacht for private pleasure only with no charter use. (Id.; Ex. 4, Myers. Tr. pp. 36-42, 44-45; Exs. 15 and 16).[9] In January, 2002, Treanor sold the 48' Hatteras "SQUID ROW" and purchased the 53' Ocean "SQUID ROW." (Ex. 3, Treanor Tr. pp. 55, 57, 59). Once again, Treanor's signed application and the subsequent Confirmation of Insurance clearly indicated Treanor's intent to use that vessel for charter. (Ex. 3, Treanor Tr. pp. 59-62, 64-65; Ex. 4, Myers Tr. pp. 54-60; Exs. 17, 18 and 13).

In September, 2003, Treanor sold the 53' Ocean "SQUID ROW" which included the take back by trade of a 1999 40' Ocean yacht. (Ex. 3, Treanor Tr. pp. 75, 77-78). At about the same time, Treanor also purchased the 60' Jim Smith which is the subject of this dispute. (Id. at pp. 77-78, 81-83). Treanor solicited insurance coverage on both these yachts through C.A. Hansen. (Ex. 3, Treanor Tr. pp. 85-87; Ex. 4, Myers Tr. pp. 70-72). The C.A. Hansen intake sheet for the 60' Jim Smith recorded Treanor's intended use of that vessel as "Occasional Charter with Captain" (Ex. 4, Myers Tr. pp. 72-74; Ex. 20). However, Treanor failed to disclose charter use on the signed application (Ex. 21), and the ACE/INAMAR quote failed to include charter coverage (Ex. 22). (Ex. 3, Treanor Tr. pp. 89-95; Ex. 4, Myers Tr. pp. 74-76, 78-80). ACE/INAMAR was then asked to re-quote the 60' Jim Smith with charter coverage but declined to do so. (Ex. 4, Myers Tr. pp. 82-83; Ex. 19). Thereafter, C.A. Hansen placed charter coverage on the 60' Jim Smith with Zurich, whose Confirmation of Insurance clearly acknowledged

---

[9] The testimony is clear that the vessel name "SQUID ROW" in Ex. 15 was an error. The 50' AZIMUT was never named SQUID ROW. (Ex. 3, Treanor Tr. pp. 46-48; Ex. 4, Myers Tr. pp. 47-48, 50).

Treanor's intended charter use of the vessel, stating "private pleasure use with occasional charter coverage, warranted a maximum of 21 days of 6 passenger charter per policy year." (Ex. 3, Treanor Tr. pp. 101-102, 105; Ex. 4, Myers Tr. pp. 88-91; Ex. 23).[10]

On or about October 9 or 10, 2003, Treanor cancelled the insurance coverages on the 60' Jim Smith and the 1999 40' Ocean placed by C.A. Hansen, advising C.A. Hansen for the first time that he had "located coverage for both boats elsewhere saving over $7,000.00 annually." (Ex. 3, Treanor Tr. pp. 80, 106-107, 151; Ex. 4, Myers Tr. pp. 91-94; Ex. 24).[11]  Mrs. Diane Myers, Treanor's customer service representative at C.A. Hansen, testified that up until that time, C.A. Hansen had no idea that Treanor was shopping his insurance coverage on the 60' Jim Smith and the 40' Ocean with another broker, i.e., Christi. (Ex. 4, Myers Tr. pp. 86-87, 93). Similarly, McDowell of Christi testified that he was never advised that Treanor was utilizing another insurance broker, C.A. Hansen, to solicit insurance coverage on these vessels or that C.A. Hansen had actually placed coverage on both vessels. (Ex. 1, McDowell Tr. pp. 75, 108-109, 120-21, 211, 213).[12]

## LEGAL ANALYSIS

### POINT I:    THE STANDARD FOR SUMMARY JUDGMENT

---

[10] C.A. Hansen also placed coverage on the 1999 40' Ocean with ACE/INAMAR for private pleasure use only. It was Mr. Treanor's intent to sell this vessel that he took in trade for the 53' Ocean as soon as possible. (Ex. 3, Treanor Tr. pp. 142-45, 147-49).

[11] Captain Swain testified that Treanor was "pull[ing] a fast one" in that Treanor had to know, based on the low premium, that he was not buying charter insurance (Ex. 6, Swain Tr. pp. 81-84), and that Treanor is very quick to put the blame on others for his own mistakes. (Id. at pp. 95).

[12] After the sinking of the 60' Jim Smith, Treanor insured two (2) different vessels through another broker, Strickland Marine (Treanor's designated expert witness in this case). For each of those two vessel applications, Treanor misrepresented that he had no losses even though he was claiming a total loss on the Jim Smith. (Ex. 5, Strickland Tr. pp. 61-64, 70, 72, 76-77, 82-83, 121-25; Ex. 3, Treanor Tr. pp. 198-204, 261-62; Ex. 28; Ex. 29).

"Summary judgment is appropriate only 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Smith ex rel. Estate of Smith v. Church Mut. Ins. Co., 2005 WL 1594854 (D.S.C. 2005). "Rule 56(c) mandates entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case.'" Id. Disposition by summary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. McMahan v. Int'l Assoc. of Bridge, Structural & Ornamental Iron Workers, 858 F.Supp. 529, 535 (D.S.C. 1994).

No genuine issue of material fact exists concerning 1) defendant's misrepresentations of material fact regarding the use of the yacht, thereby voiding the Policy, and 2) that Connecticut Indemnity had a reasonable basis to deny the claim. Taking the record as a whole, no rational trier of fact could find for the defendant on these issues. With respect to defendant's third through eighth counterclaims, defendant cannot establish the existence of elements essential to each of these counterclaims.

## POINT II:    CHOICE OF LAW

Marine insurance contracts, including hull and protection and indemnity policies, are maritime contracts within the admiralty and maritime jurisdiction of the federal courts. See Sirius Ins. Co. (UK) Ltd. v. Collins, 16 F.3d 34 (2d Cir. 1994); Acadia Ins. Co. v. McNeil, 116 F.3d 599 (1st Cir. 1997); La Reunion Francaise S.A. v. Barnes, 247 F.3d 1022 (9th Cir. 2001); Continental Ins. Co. v. Lone Eagle Shipping Ltd. (Liberia), 952 F.Supp. 1046 (S.D.N.Y. 1997), aff'd, 134 F.3d 103 (2d Cir. 1998); Wells Fargo Bank Int'l Corp. v. London Steam-Ship Owners' Mut. Ins. Assoc., Ltd., 408 F.Supp. 626 (S.D.N.Y. 1976).

Marine insurance contracts are governed and controlled by the general federal maritime law of the United States. See Advani Enterprises, Inc. v. Underwriters at Lloyds, 140 F.3d 157, 162 (2d Cir. 1998); Commercial Union Ins. Co. v. Detyens Shipyard, Inc., 147 F.Supp.2d 413, 420 (D.S.C. 2001) ("... federal maritime law will govern the construction and interpretation of the policy on those issues where a judicially established federal maritime rule exists."). However, in the absence of both (a) a well-established federal admiralty rule and (b) a determination by the Court that a new rule should be fabricated, the court should apply state law in construing a marine insurance policy. Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 312, 75 S.Ct. 368, 99 L.Ed. 337 (1955); See Contract Marine Carriers, Inc. v. Abbott Laboratories, Int'l., 1993 WL 106374, *5-6, 1993 A.M.C. 1841 (S.D.N.Y. 1993)(New York law governed the construction of an "other insurance" clause in a marine cargo policy.)

In order to determine which state's law is applicable to the policy of marine insurance in the absence of an established federal maritime rule, a federal court sitting in admiralty must apply federal choice of law rules. See State Trading Corp. of India, Ltd. v. Assuranceforeningen Skuld, 921 F.2d 409, 414 (2d Cir. 1990). Under the federal choice of law rules, a Court must ascertain and value the contacts between the transaction and the state whose competing laws are involved. Advani, 140 F.3d at 162. Here, Connecticut Indemnity was incorporated and located in Connecticut. Treanor was and is a resident of South Carolina. (Ex. 3, Treanor Tr. p. 5). Coverage was solicited by Treanor's broker, Christi, located in New Jersey, from Marine MGA, located in New Hampshire. Coverage was bound and a policy was issued in New Hampshire. The yacht, which was the subject matter of the insurance, was berthed in South Carolina and the loss occurred in South Carolina.

Connecticut Indemnity contends that established federal maritime law governs this action. For those issues where no controlling federal maritime law exists, Connecticut Indemnity contends that in balancing the contacts, South Carolina law would govern.

**POINT III:    CHRISTI IS THE AGENT OF THE INSURED, TREANOR**

Under South Carolina law, an insurance broker is "ordinarily one who acts as a middleman between the insured and insurer and who solicits insurance from the public under no employment from any special company, but having secured an order, either places the insurance with a company selected by the insured or with a company selected by the broker himself." Allstate Ins. Co. v. Smoak, 256 S.C. 382, 392, 182 S.E.2d 749, 754 (1971). "A broker is ordinarily employed by a person seeking insurance, and when so employed, is to be distinguished from the ordinary insurance agent who is employed by an insurance company to solicit and write insurance in the company." Allstate, 256 S.C. at 393, 182 S.E.2d at 754. "Generally, an insurance broker is the agent of the insured, and not the insurer." Id. The mere fact that a broker receives a commission from the insurer for placing the insurance does not change the broker's character as an agent of the insured. See id. A broker acting for the insured has no authority to bind the insurer. See id. Under South Carolina law, an insurance broker represents people seeking insurance, while an insurance agent represents the insurance company. See Gunnells v. Healthplan Services, Inc., 348 F.3d 417, 437 (4th Cir. 2003).

Christi admits that its clients are the individuals and businesses seeking to obtain insurance on their vessels and things. (See footnote 4, supra). Christi obtains these clients through referrals, advertising and attending industry events such as boat shows and fishing tournaments. (Id.). Mr. Treanor was referred to Christi by Wayne Abernathy, a Florida yacht broker who brokered the sale of several vessels owned by Treanor, including the 60' Jim Smith,

and who referred business to Christi in the past. (See p. 4, supra). Treanor solicited Christi to obtain insurance coverage on his behalf on the 60' Jim Smith and another yacht, a 40' Ocean. (Ex. 1, McDowell Tr. pp. 51-53, 82, 117, 254). At the same time, Treanor was utilizing another marine insurance broker, C.A. Hansen, to seek coverage for the same two (2) vessels. (See pp. 12-13, supra).

Christi submitted applications to four (4) different marine insurers to request quotes for coverage on the 60' Jim Smith. (Ex. 1, McDowell Tr. pp. 117, 219-21).[13] Christi provides its clients with the best option. (Id. at 43-45). Marine MGA's quote happened to be the lowest. Mr. McDowell admitted that Christi had no authority to bind Marine MGA or Connecticut Indemnity, and that all underwriting decisions were made by Marine MGA. (Ex. 1, McDowell Tr. pp. 186-87, 276; Sterling Aff. ¶¶ 10 and 11).[14]  Finally, Mr. Treanor testified in his deposition that Christi was his agent. (Ex. 3, Treanor Tr. pp. 136, 283).

---

[13] Christi approached only one (1) insurer, Travelers, with respect to the 40' Ocean. (Ex. 1, McDowell Tr. pp. 117, 254-256). Christi was not obligated to submit an application to any particular insurer. (See footnote 4, supra).

[14] In fact, the "Producer Agreement" between Christi and Marine MGA (Sterling Aff. Ex. "B") clearly dispels any such authority stating, in relevant part:

> 2.    PRODUCER AUTHORITY
> a)    Nothing contained in this Agreement shall be construed to designate the Producer an agent for MMGA in any respect and in accordance with the laws of the state of Pennsylvania the Producer does not have the authority to make representations on behalf of MMGA or to obligate MMGA to clients of Producer to insurers represented by MMGA or to any other third parties.
>
> * * *
>
> 7.    RELATIONSHIP BETWEEN PARTIES
> a)    The Producer shall act as an independent contractor and not as an employee, joint venturer or partner of MMGA.

17

No reasonable trier of fact could find that Christi was the agent of anyone other than

Matthew Treanor in obtaining the subject policy. Any misrepresentations and/or non-disclosures

made by Christi to Marine MGA are imputed to Mr. Treanor.[15]  See Citizens Savings Bank,

F.S.B. v. Verex Assurance, Inc., 883 F.2d 299, 302 (4th Cir. 1989).

### POINT IV:    THE SUBJECT POLICY IS VOID *AB INITIO* DUE TO TREANOR'S MATERIAL MISREPRESENTATIONS

Contracts of marine insurance are governed by the doctrine of uberrimae fidei, or utmost

good faith, which imposes upon an insured a strict obligation to reveal fully and truthfully all

circumstances within its knowledge which may influence the terms of the risk.  In Sun Mutual

Ins. Co. v. Ocean Ins. Co., 107 U.S. 485, 510-511, 1 S.Ct. 582, 600 (1883), the United States

Supreme Court defined the doctrine of uberrimae fidei, stating:

> It is the duty of the assured to place the underwriter in the same
> situation as himself: to give him the same means and opportunity
> of judging of the value of the risks; and when any circumstance is
> withheld, however slight and immaterial it may have seemed to

---

> Nothing contained in this Agreement shall be construed so as to
> create the relationship of employer and employee between MMGA
> and the Producer.
>
> The Producer may exercise his own discretion and judgment
> concerning the time and manner of performance of his services
> except that he shall at all times comply with the rules and
> regulations of MMGA.  The Producer shall be an appointee of
> MMGA and not an agent of any insurance company represented by
> MMGA.

Strickland Marine, another marine insurance broker, testified to an identical relationship to
Marine MGA. (Ex. 5, Strickland Tr. pp. 38-41).

[15] A factual dispute exists between Christi and defendant Treanor as to whether Treanor told
Christi that the yacht would be used for charter.  Treanor testified he did.  Christi testified he did
not.  This dispute in no way affects Connecticut Indemnity, since it is undisputed that neither Mr.
Treanor, nor his agent Christi, told Marine MGA anything other than that the yacht would be
used solely for private pleasure purposes.  (Ex. 3, Treanor Tr. pp. 133-34, 222-23; Ex. 1,
McDowell Tr. pp. 77-78, 94-95, 189-91, 269, 279; Sterling Aff. ¶¶ 32-35).

himself, that, if disclosed, would probably have influenced the
terms of the insurance, the concealment vitiates the policy.

The doctrine of utmost good faith (uberrimae fidei) has been fully embraced by the vast

majority of federal courts. See Puritan Ins. Co. v. Eagle Steamship Co., S.A., 779 F.2d 866 (2d.

Cir. 1985); East Coast Tender Services, Inc. v. Robert T. Winzinger, Inc., 759 F.2d 280, 284 n.3

(3rd Cir. 1985) (recognizing "that in the maritime context a boat owner must meet its duty of

uberrimae fidae…"); CIGNA Property and Cas. Inc. Co. v. Polaris Pictures Corp., 159 F.3d 412

(9th Cir. 1998); Kilpatrick Marine Piling v. Fireman's Fund Ins. Co., 795 F.2d 940, 942 (11th Cir.

1986) ("[t]he general rule of marine insurance, requiring full disclosure, is well settled in this

circuit, and as a clear rule of maritime law it is the controlling rule even in the face of contrary

state authority."); Certain Underwriters at Lloyd's v. Johnson, 124 F.Supp.2d 763 (D.P.R. 1999).

In Commercial Union Ins. Co. v. Detyens Shipyard, Inc., 147 F.Supp.2d 413 (D.S.C. 2001), the

District Court of South Carolina held that "the doctrine of utmost good faith is a firmly

entrenched federal maritime doctrine, applicable to the marine insurance policy in this case." Id.

at 424.[16]

Under the doctrine of utmost good faith (uberrimae fidei), an insured is required to fully

and voluntarily disclose to the insurer all facts material to a calculation of the insurance risk,

whether or not inquired into by the insurer. See HIH Marine Services, Inc. v. Fraser, 211 F.3d

1359, 1362 (11th Cir. 2000); Cigna Property and Cas. Ins. Co. v. Polaris Pictures Corp., 159 F.3d

412, 420 (9th Cir. 1998), cert. denied, Polaris Pictures Corp. v. Cigna Property and Cas. Ins. Co.,

---

[16] The Fifth Circuit is the only circuit to have held to the contrary, i.e., that the doctrine of utmost good faith did not constitute entrenched federal precedent. Albany Ins. Co. v. Anh Thi Kieu, 927 F.2d 882, 886 (5th Cir. 1991). Nevertheless, defendant's arguments that uberrimae fidei is not an entrenched federal maritime rule or that it is not entrenched in the Fourth Circuit or that it is a dying doctrine or that it should not be applied to a yacht even though the yacht was being used commercially are plainly wrong.

19

528 U.S. 815, 120 S.Ct. 53 (1999). An insured's failure to make such a disclosure, "whether it be willful or accidental, or result from mistake, negligence or voluntary ignorance, avoids the policy." Steelmet, Inc. v. Caribe Towing Corp., 747 F.2d 689, 695 (11th Cir. 1984); Detynes Shipyard, 147 F.Supp. 2d at 423. The doctrine of utmost good faith is based upon the principle that "[s]ince the insured is in the best position to know any circumstances material to the risk, the insured must reveal those facts to the underwriter, rather than wait for the underwriter to inquire." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 13 (2d Cir. 1986).

Here, there is no factual dispute that misrepresentations were made. The initial application forwarded by Christi to Marine MGA on or about September 16, 2003, on which the initial quote was based, answered "No" to the following inquires:

      1.    Is the boat chartered to others?
      2.    Is the boat used commercially or for business purposes?

Further, the survey report provided to Marine MGA prior to coverage being bound confirmed that the vessel would be used for private pleasure purposes only. Mr. McDowell, of Christi, testified that at no time whatsoever up to the time the vessel sank in May, 2004, did he ever advise anyone at Marine MGA and/or Connecticut Indemnity that the vessel would be used for anything other than private pleasure purposes. (Ex. 1, McDowell Tr. pp. 221-223, 268-269, 279). McDowell was adamant that Treanor never requested any coverage other than private pleasure use only and never disclosed charter use of the 60' Jim Smith or any commercial or business use. (Ex. 1, McDowell Tr. pp. 94-95, 110, 189-91, 199, 210-215).[17]

_____

[17] Mr. McDowell further testified that he was never told that Treanor was a principal in Palmetto Charters and/or in Squid Row Charters, or that Treanor had owned prior charter boats named SQUID ROW. (Id.). See also footnote 15.

20

However, Treanor has admitted that at all times during the application process, he knew that he would charter the yacht during the policy period, and has further admitted to numerous charters during the policy period prior to the vessel's sinking.[18] Accordingly, there is no doubt that a misrepresentation as to the vessel's use was made to underwriters.

The issue of materiality is conclusively established where, as here, an untrue answer is given to an insurer's specific inquiry in the application for insurance, thereby voiding the policy. See Bella S.S. Co. v. Insurance Co. of North America, 5 F.2d 570, 572 (4th Cir. 1925) ("[W]hen a specific inquiry concerning the risk is made and an untrue answer given, the policy is avoided whether inquiry and answer were … material or not, because the insurer has the right to decide for himself what is material to his risk, and his inquiry is notice to the applicant for insurance that he regards the answer material."); see also Certain Underwriters at Lloyd's v. Montford, 52 F.3d 219, 222, 1995 A.M.C. 1201 (9th Cir. 1995) (vessel's purchase price was "unquestionably a fact material to the risk" where the application specifically asked for the purchase price); Kerr v. Union Marine Ins. Co., 130 F. 415, 417 (2d Cir. 1904) (misrepresentation made by insured in response to specific question in application will be conclusively presumed to have been material to the risk), cert. denied, 194 U.S. 635, 24 S.Ct. 858, 48 L.Ed. 1160 (1904). There is no dispute that the application submitted on Treanor's behalf provided untrue answers to specific inquiries

---

[18] Although the purchase of the 60' Jim Smith closed on September 29, 2003, and coverage was bound with Connecticut Indemnity on October 7, 2003, the vessel was in Florida undergoing repairs until mid-March, 2004, when it was brought to Charleston. Due to problems with the vessel's fuel tanks, it was not available for charter until the beginning of April, 2004. Captain Swain testified that the plan all along was to use the 60' Jim Smith for the same purpose as the 53' Ocean : to run sport fishing charters. Captain Swain testified that from early April to the time of the sinking on May 31, 2004, the vessel was chartered some 10-12 times. Captain Swain testified that they had not yet reached the heavy charter months of June, July and August, during which he expected that the 60' Jim Smith would be chartered three (3) to five (5) days a week. (Ex. 6, Swain Tr. pp. 31-39, 41-42, 46-48, 51, 72-73).

concerning the use of the yacht. These untrue answers constitute material misrepresentations which render the Policy void ab initio.

Notwithstanding that the specific questions concerning the commercial use and chartering of the vessel conclusively establish the materiality of such facts, there can be no doubt that the misrepresentations and nondisclosures concerning the vessel's use were material to Mr. Sterling at Marine MGA. Under federal maritime law, where no specific question is asked, a fact is material if it "could possibly influence the mind of a prudent and intelligent insurer in determining whether he would accept the risk." Kilpatrick Marine, 795 F.2d at 942-43. In Gulfstream Cargo Ltd. v. Reliance Ins. Co., 409 F.2d 974 (5th Cir. 1969), the Court stated:

> All facts are material which would affect the mind of a rational underwriter, governing himself by the principles on which underwriters in practice act, as to either of the following points: 1st, whether he will take the risk at all; 2nd, at what premium will he take it... The duty attaches at the time of effecting the insurance, *** for the effect of a concealment in avoiding the policy is to be determined not by its eventual relation to the nature of the risk, but with reference to its immediate influence on the judgment of the underwriter.

Id. at 981, n.22. See also Albany Ins. Co. v. Horak, 1994 A.M.C. 273, 282, 1993 WL 269620, *7 (E.D.N.Y. 1993) ("materiality in insurance context is whether fact or omission could reasonably have affected the insurer's decision to enter into the contract, or its evaluation of the degree or character of the risk, or its calculation of the premium") (citing John Jovino Co. v. Fireman's Fund Ins. Co., 1992 WL 176956, *7 (S.D.N.Y. 1992)); Northfield Ins. Co. v. Barlow, 983 F.Supp. 1376, 1380 (N.D.Fla. 1997) ("[t]he standard for what information qualifies as material is very broad, and in the case of marine insurance a fact is material if it might have a bearing on the risk to be assumed by the insurer..."); Crowley Marine Services, Inc. v. Hunt, 1995 A.M.C. 2562, 2569, 1995 WL 694094, *5 (W.D.Wash. 1995) ("[a] fact is material if it would influence the

judgment of a reasonable insurer in fixing the premium or in determining if it will take the risk.")[19] Thus, a fact is material if it influences an underwriters' 1) decision to enter into the contract, 2) evaluation of the degree or character of the risk, or 3) calculation of the premium.

Even under this standard, there is, similarly, no doubt that the misrepresentations as to the vessel's intended use were material to Mr. Sterling. Marine MGA utilized two (2) separate and distinct insurance policies, containing different terms and conditions, depending on the use of the vessel. (Sterling Aff. ¶ 20). Had Treanor's charter use been disclosed, Marine MGA would not have issued its Yacht Policy, which is an all risks policy designed for recreational, private pleasure use boaters but, rather, would have issued a named perils form policy (i.e., Taylor form) it uses for risks it deems "commercial", such as sports charter fishing. (Sterling Aff. ¶¶ 20, 30, 36). Furthermore, had charter use been disclosed, the vessel quote would not have been based on the lower rates set forth in Marine MGA's schedules of physical damage (hull rates) and liability (P&I) premiums for private pleasure use vessels, but rather would have been based on the higher rates set forth in Marine MGA's "Commercial Sportfishing Rates", which would have resulted in an increase in premium from the $5,403.00 quoted to $8,700.00.[20] (Sterling Aff. ¶¶ 15, 17, 30, 36-39). Therefore, had the true use of the vessel been disclosed, Connecticut Indemnity, through Marine MGA, would have charged a premium significantly higher than the premium charged for

---

[19] Under the doctrine of uberrimae fidei, there is absolutely no requirement that the misrepresentation or non-disclosure be causally connected to the loss. The same would be true under South Carolina state law. See Carroll v. Jackson Nat. Life Ins. Co., 307 S.C. 267, 269, 414 S.E.2d 777 (S.C. 1992).

[20] Unlike ACE/INAMAR, however, Marine MGA's underwriting philosophy accounts for the greater risk associated with charter coverage predominantly in the hull portion of the premium since charter vessels are used a great deal more frequently than vessels for private pleasure only and, therefore, have a greater chance of sustaining physical damage. (Sterling Aff. ¶¶ 15, 17, 37-39).

the Yacht Policy and offered only more restrictive, named perils coverage.[21] Mr. McDowell confirmed that, based on his experience with Marine MGA, Marine MGA would not have issued its Yacht Policy, only the more restrictive named perils policy and at a higher premium, had the true information been disclosed to it. (Ex. 1, McDowell Tr. pp. 108, 171-73, 191-93).[22]

Furthermore, all three (3) marine insurance brokers deposed in this action (i.e., Christi, Brown & Brown Marine and Treanor's designated expert, Strickland Marine) uniformly admitted that the question of a vessel's use is material to all of the marine insurance companies from which they seek quotes. (Ex. 1, McDowell Tr. pp. 187-90; Ex. 4, Myers Tr. pp. 22-25, 104-05; Ex. 5, Strickland Tr. pp. 42-45, 52, 53-59, 101-102, 132).

A near identical situation to the instant case was presented in La Reunion Francaise, S.A. v. Thompson, 1999 WL 1293470 (S.D.Fla. 1999)[23], rev'd in part, vacated in part, 248 F.3d 1177 (11th Cir. 2001)[24], appeal after remand, 2002 WL 31174180 (11th Cir. 2002).[25] There, the insurer commenced a declaratory judgment action to establish that a marine insurance policy was void because of the insured's misrepresentations concerning the commercial use of the yacht. The insured had answered "no" to the following questions contained in the insurance application:

---

[21] In addition to different, more restrictive coverage terms, under a named perils policy, the burden of proof is on the insured to prove the loss was covered whereas under an all risk policy, the insured need only establish a prima facie case and the burden of proof switches to the insurer to prove the loss falls within an exclusion to coverage. See Northwestern Mut. Life Ins. Co. v. Linard, 498 F.2d 556 (2d Cir. 1974). While there is no element of causal connection to the loss in a material misrepresentation case, the burdens of proof would be of great significance in this case since Mr. Treanor alleges that the loss resulted from bad fuel (Ex. 3, Treanor Tr. pp. 204-207), while Capt. Swain testified that there was no problem with the fuel or the new tanks. (Ex. 6, Swain Tr. pp. 51-52, 54-59, 63-65).

[22] Mr. McDowell also confirmed that had Treanor requested charter use, McDowell would have submitted a completely different application to Marine MGA. (Ex. 1, McDowell Tr. p. 108, 265).

[23] Ex. 25.

[24] Ex. 26.

[25] Ex. 27.

1. IS THE BOAT CHARTERED TO OTHERS WITH CAPTAIN?

2. IS THE BOAT CHARTERED TO OTHERS WITHOUT CAPTAIN?

6. IS THE BOAT USED COMMERCIALLY OR FOR BUSINESS PURPOSES?

Upon the destruction of the vessel by fire, the insured submitted a claim for the insured value of the vessel. After investigation, the insurer denied the claim, alleging that the insured utilized the vessel for commercial chartering, which constituted a material misrepresentation, thereby voiding the policy. In the reported decision, 1999 WL 1293470 (Ex. 25), the trial court granted summary judgment in favor of the insurer, finding that the insurer produced significant record evidence tending to show that the vessel was used for commercial purposes, i.e., charters. The insured appealed. In an unreported decision (Ex. 26), the Eleventh Circuit reversed and remanded the action for trial on the grounds, inter alia, that while the insurer offered substantial circumstantial evidence of intended commercial use, there was no evidence of an actual incidence of commercial use during the policy period. Thus, there remained a question of fact as to whether the insured had actually used the boat for a commercial purpose during the policy period. Following a bench trial, the district court found that the insured had actually chartered the vessel during the policy period, and therefore, made material misrepresentations in the insurance application process, thereby voiding the policy both pursuant to policy terms and under the doctrine of uberrimae fidei. In a further unreported decision by the Eleventh Circuit (Ex. 27), the Court affirmed the judgment of the trial court voiding coverage under the marine insurance policy, stating that "the district court correctly applied the doctrine of uberrimae fidei, a principal of marine insurance law describing the duty of utmost good faith borne by the insured."

25

In another remarkably similar case, <u>Certain Underwriters at Lloyds, London v. Giroire</u>, 27 F.Supp.2d 1306, 1313-14, 1998 A.M.C. 2153 (S.D.Fla. 1998), the Court held that a misrepresentation in an application that the insured would not race his yacht was material and voided an ocean marine policy <u>ab inito</u> under the doctrine of <u>uberrimae fidei</u> where underwriter would not have issued policy had it known of insured's plan to use yacht for racing.

Defendant's argument that certain provisions of the Policy preclude the application of <u>uberrimae fidei</u> is without merit. The undisputed evidence establishes that but for defendant's material misrepresentations, the Policy (and therefore the provisions relied on by defendant), would never have been issued. The provisions defendant relies on are not found in the named perils (Taylor Hull form) policy. Defendant cannot use clauses from a policy that he obtained because of his material misrepresentations to argue that the misrepresentations were not material to that policy. For the same reasons, defendant's argument that chartering diminishes the risk is similarly unavailing. The misrepresentations were the only reason defendant obtained the policy he did. Defendant's further argument of unclean hands is without legal and factual merit.

Here, the undisputed evidence establishes that at all times, Treanor knew that the yacht would be used for charter, and did in fact charter the yacht on numerous occasions. Treanor admits these facts. Consequently, Treanor's insurance application contained material misrepresentations, thereby voiding the policy. Accordingly, summary judgment is warranted on these undisputed facts.

**POINT V:     ALTERNATIVELY, TREANOR'S SUBSEQUENT SUBMISSION OF THE FORMAL SIGNED APPLICATION AFTER COVERAGE WAS BOUND AND/OR HIS ACTUAL CHARTER USE OF THE VESSELDURING THE POLICY PERIOD CONSTITUTES INTENTIONAL MISREPRESENTATIONS AND/OR CONCEALMENTS WHICH VOID THE POLICY BY ITS EXPRESS TERMS**

Connecticut Indemnity contends that the all risk private pleasure yacht policy at issue herein was obtained solely due to the material misrepresentations made by, or on behalf of, defendant Treanor and that, therefore, the Policy is void ab initio. Assuming, albeit denied, that the Policy is not void, Connecticut Indemnity argues in the alternative that Treanor's material misrepresentations in the formal signed application concerning the chartering and/or commercial use of the subject vessel constitutes a breach of the Policy, and therefore, Treanor is not entitled to coverage for the loss of the subject vessel.[26]

The Policy provides, in relevant part:

> 12. **CONCEALMENT OR MISREPRESENTATION**: All coverage provided by us will be voided if you intentionally conceal or misrepresent any material fact or circumstance relating to this insurance, whether before or after a loss.

During his deposition, Treanor admitted that he signed the formal application and returned it to Christi on November 17, 2004, more than one month after coverage was bound. (Ex. 3, Treanor Tr. pp. 134-36, 139-40). Treanor further admitted that at the time he signed this application, he knew that the information regarding the vessel's use was incorrect, yet signed and sent the application without making any changes. (Ex. 3, Treanor Tr. pp. 253-54, 281-84). Treanor testified that he did this because McDowell told him not to worry about it. (Id.). Mr. McDowell denies he said anything at all to that effect. (Ex. 1, McDowell Tr. pp. 71-72, 160). In either case, an intentional misrepresentation was made to Marine MGA, whether by Treanor himself or by his agent, Christi. Pursuant to Clause 12 of the Policy's General Conditions, Connecticut Indemnity is entitled to void the Policy.

---

[26] Defendant has somehow manipulated this straight forward defense based on policy language into a creation all his own which he calls "warranty against misrepresentation". Warranty has absolutely nothing to do with this defense.

Furthermore, Treanor received the actual Policy shortly after January 13, 2004. By law, Treanor has a duty to read the policy he purchases and is deemed to know the terms and conditions of the Policy and to abide by such terms, even if he alleges he never read it. <u>See</u> <u>Walpole v. Great American Ins. Co.</u>, 914 F.Supp. 1283 (D.S.C. 1994). The Policy expressly forbids charter or commercial or business use unless prior written permission is received. Despite the express Policy terms, Treanor repeatedly chartered the vessel without disclosing the same to insurers. Such intentional concealment entitles underwriters to void the Policy pursuant to Clause 12 of the General Conditions. Treanor intentionally concealed the fact that he was using the vessel for chartering.

### POINT VI: CONNECTICUT INDEMNITY IS ENTITLED TO SUMMARY JUDGMENT ON DEFENDANT'S FIRST COUNTERCLAIM FOR BAD FAITH

The Supreme Court of South Carolina has recognized a cause of action for bad faith refusal to pay first party benefits due under an insurance contract based on a breach of the implied covenant of good faith and fair dealing arising out of the insurance contract. <u>See</u> <u>Nichols v. State Farm Mutual Automobile Ins. Co.</u>, 279 S.C. 336, 306 S.E.2d 616 (S.C. 1983) (holding "if an insured can demonstrate bad faith or unreasonable action by the insurer in processing a claim under their mutually binding insurance contract, he can recover consequential damages in a tort action.").[27] A bad faith action lies in tort and is not an action in contract.

Under South Carolina law, in order to establish a bad faith claim against an insurance company, the insured must show: (1) the existence of a mutually binding contract of insurance between plaintiff and defendant; (2) an insurer's refusal to provide benefits due under the contract; (3) resulting from the insurer's bad faith or unreasonable action in breach of an implied

---

[27] Punitive damages are only available where an insured can prove conduct that is willful or in reckless disregard of the insured's rights. (<u>Id.</u>). Here, defendant Treanor has not alleged any

covenant of good faith and fair dealing arising out of the contract; and (4) causing damage to the insured. See Cock-n-Bull Steak House, Inc. v. Generali Ins. Co., 321 S.C. 1, 6, 466 S.E.2d 727, 730 (S.C. 1996) (fire insurer acted in bad faith by refusing to pay insured restaurant owner's claims where there was no reasonable basis to deny claim).

Under this judicially created cause of action, "an insurer acts in bad faith where there is no reasonable basis to support the insurer's decision." American Fire and Casualty Co. v. Johnson, 332 S.C. 307, 311, 504 S.E.2d 356, 358 (1998); Cock-N-Bull, 321 S.C. at 6, 466 S.E. 2d at 730 ("An insured may recover damages for a bad faith denial of coverage if he or she proves there was no reasonable basis to support the insurer's decision to deny benefits under a mutually binding insurance contract."). If there is any reasonable ground for contesting the claim, there is no bad faith. See Crossley v. State Farm Mut. Auto. Ins. Co., 307 S.C. 354, 360, 415 S.E.2d 393, 397 (S.C. 1992); Varnadore v. National Mut. Ins. Co., 289 S.C. 155, 345 S.E. 2d 711 (1986); Helena Chemical Co. v. Allianz Underwriters Ins. Co., 357 S.C. 631, 645, 594 S.E.2d 455, 462 (2004)(affirming grant of summary judgment to insurer on issue of bad faith); Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 493 (4th Cir. 2005)(reversing district's court's refusal to grant judgment as a matter of law to insurer on bad faith claim).

As a matter of law, Mr. Treanor cannot sustain his burden of proving that there was no reasonable basis to support Connecticut Indemnity's denial of his claim. Rather, the undisputed evidence, as well as case law directly on point, clearly and indisputably establishes that Connecticut Indemnity had not only a reasonable basis, but a meritorious basis, to deny Mr. Treanor's claim.

---

willful or reckless conduct in his pleadings. Therefore, defendant's claim for punitive damages must be dismissed outright.

**POINT VII: CONNECTICUT INDEMNITY IS ENTITLED TO
SUMMARY JUDGMENT ON DEFENDANT'S THIRD COUNTERCLAIM
FOR BREACH OF CONTRACT ACCOMPANIED BY A FRAUDULENT ACT**

In order to maintain an action for breach of contract accompanied by a fraudulent act, the plaintiff must prove three elements: (1) a breach of contract, (2) fraudulent intent relating to the breaching of the contract and not merely to its making, and (3) a fraudulent act accompanying the breach. See Conner v. City of Forest Acres, 348 S.C. 454, 465-66, 560 S.E.2d 606, 612 (2002); RoTec Services, Inc. v. Encompass Services, Inc., 359 S.C. 467, 471, 597 S.E.2d 881 (S.C.App. 2004); Osborn v. University Medical Associates of Medical University of South Carolina, 278 F.Supp.2d 720, 740 (D.S.C. 2003). The standard of proof for the third element of the cause of action is "clear and convincing evidence." Osborn, 278 F.Supp.2d at 740.[28] The fraudulent act alleged must be an act done with the intent to deceive. See Osborn, 278 F.Supp.2d at 740. Accordingly, evidence of fraud is essential, and courts will dismiss complaints that fail to allege fraudulent intent or a fraudulent act. See id. A mere violation of a contract will not support an allegation of fraud. See Vann v. Nationwide Ins. Co., 257 S.C. 217, 220-21, 185 S.E.2d 363, 364 (1971); Kelly v. Nationwide Mut. Ins. Co., 278 S.C. 488, 298 S.E.2d 454 (1982); Rutledge v. St. Paul Fire and Marine Ins. Co., 286 S.C. 360, 334 S.E.2d 131 (S.C.App. 1985).

Here, there is no evidence to support any of the elements of this cause of action. Since the policy was void, Connecticut Indemnity could not be in breach. Furthermore, there is neither evidence of fraudulent intent nor clear and convincing evidence of a fraudulent act. Therefore, Connecticut Indemnity is entitled to summary judgment on this counterclaim.

**POINT VIII: CONNECTICUT INDEMNITY IS ENTITLED TO SUMMARY JUDGMENT ON DEFENDANT'S FOURTH COUNTERCLAIM FOR NEGLIGENCE**

In order to establish a claim for negligent breach of contract, Treanor must prove that Connecticut Indemnity owed him a duty of care which existed independent of its duty under the contract. See John Brown Engineering, Ltd. v. Herman Ludwig, Inc., 1991 WL 244452 (D.S.C. 1991), aff'd, 960 F.2d 146 (4th Cir. 1992). No such duty exists here. Even assuming such a duty existed, which is denied, there is no evidence of a breach of any such duty.

**POINT IX: CONNECTICUT INDEMNITY IS ENTITLED TO SUMMARY JUDGMENT ON DEFENDANT'S FIFTH COUNTERCLAIM FOR NEGLIGENT MISREPRESENTATION**

In order to establish liability for negligent misrepresentation, a plaintiff must prove that: (1) the defendant made a false representation to the plaintiff, (2) the defendant had a pecuniary interest in making the representation, (3) the defendant owed a duty of care to see that he communicated truthful information to the plaintiff, (4) the defendant breached that duty by failing to exercise due care, (5) the plaintiff justifiably relied on the representation, and (6) the plaintiff suffered a pecuniary loss as the proximate result of his reliance on the representation. See Sauner v. Public Service Authority of South Carolina, 354 S.C. 397, 407, 581 S.E.2d 161, 166 (S.C. 2003); Brenco v. South Carolina Dept. of Transp., 363 S.C. 136, 609 S.E.2d 531, 536 (S.C.App. 2005). "Evidence of a mere broken promise is not sufficient to prove negligent misrepresentation." Winburn v. Insurance Co. of North America, 287 S.C. 435, 443, 339 S.E.2d 142, 147 (Ct.App. 1985).

---

[28] Where the substantive law mandates a "clear and convincing" standard of proof, on summary judgment, the court must consider whether a reasonable fact finder could conclude that the party had sufficient evidence to meet that burden. See Witt v. American Trucking Assoc. Inc., 860 F.Supp. 295, 300 (D.S.C. 1994).

In <u>Doub v. Weathersby-Breeland Ins. Agency</u>, 268 S.C. 319, 233 S.E.2d 111 (1977), the Court held that an insurance agency was not liable for negligent misrepresentation concerning coverage under a fire insurance policy where the insured never read the policy during the eighteen months prior to the loss. The Court stated that "one cannot complain of fraud in the misrepresentation of the contents of a written instrument in his possession when the truth could have been ascertained by his reading the instrument." <u>Id.</u> at 326.

Here, there is no evidence of any representation, false or otherwise, made by Connecticut Indemnity or Marine MGA to defendant Treanor. Christi, Mr. Treanor's agent, had no authority to make representations on behalf of Connecticut Indemnity/Marine MGA and was never instructed to make any representations whatsoever. (Ex. 1, McDowell Tr. pp. 267-68, 276). Prior to the loss, Treanor never spoke to Marine MGA or Connecticut Indemnity. (Ex. 3, Treanor Tr. pp. 133-34, 222-23). Nor is their any evidence to support any of the other elements of this cause of action, particularly detrimental reliance. Therefore, Connecticut Indemnity is entitled to summary judgment dismissing this counterclaim.

## POINT X: CONNECTICUT INDEMNITY IS ENTITLED TO SUMMARY JUDGMENT ON DEFENDANT'S SIXTH AND SEVENTH COUNTERCLAIMS FOR FRAUD AND CONSTRUCTIVE FRAUD

"Fraud is an intentional perversion of truth for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to her or to surrender a legal right." <u>Regions Bank v. Schmauch</u>, 354 S.C. 648, 672, 582 S.E.2d 432 (S.C.App. 2003). In order to prove actual fraud, the following elements must be established: (1) a representation; (2) its falsity; (3) its materiality; (4) either knowledge of its falsity or a reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; and (9) the hearer's

consequent and proximate injury. Ardis v. Cox, 314 S.C. 512, 431 S.E.2d 267, 269 (1993);

Redwend Ltd. Partnership v. Edwards, 354 S.C. 459, 503-04, 581 S.E.2d 496 (S.C.App. 2003)

The evidence of each element must be "clear, cogent and convincing." Cheney Bros., Inc. v. Batesville Casket Co., Inc., 47 F.3d 111, 114 (4th Cir. 1995). Failure to prove any one element is fatal to the plaintiff's cause of action. See id. "[T]here is no right to rely, as required to establish fraud, where there is no confidential or fiduciary relationship, and there is an arm's length transaction between mature, educated people." DeHart v. Dodge City of Spartanburg, Inc., 311 S.C. 135, 427 S.E.2d 720 (S.C.App. 1993). The right to rely must be determined in light of the plaintiff's duty to use reasonable prudence and diligence under the circumstances in identifying the truth with respect to the representations made to him. See Regions Bank, 354 S.C. at 672, 582 S.E.2d 432.

In order to establish constructive fraud, all elements of actual fraud except the element of intent must be established. See Ardis v. Cox, 314 S.C. 512, 515, 431 S.E.2d 267, 269 (Ct.App. 1993); Pitts v. Jackson Nat'l Life Ins. Co., 352 S.C. 319, 574 S.E.2d 502 (S.C.App. 2002). Intent to deceive is not an element of constructive fraud. Giles v. Lanford & Gibson, Inc., 258 S.C. 285, 288, 328 S.E.2d 916 (S.C.App. 1985) (allegation that defendant ought to have known the falsity of the representation is sufficient to support action for constructive fraud).

In a constructive fraud case, where there is no confidential or fiduciary relationship, and an arm's length transaction between mature, educated people is involved, there is no right to rely. Pitts, 352 S.C. at 334, 574 S.E.2d 502. The sale of insurance is an arm's length commercial transaction, which does not give rise to a fiduciary relationship. Id. at 331, 574 S.E.2d 502. "Because an applicant is still operating in the marketplace at the point of purchase, the insurer is

in a decidedly different position than after the contract has been entered into; thus, no heightened duty has attached." Id.

Here, there is no evidence (let alone clear and convincing evidence) to support any of the elements of a claim for fraud or constructive fraud. Simply, there was never a representation of any kind, whether false or not, made by either Connecticut Indemnity or Marine MGA to defendant Treanor. Mr. Treanor has admitted this fact. (Ex. 3, Treanor Tr. pp. 133-34, 222-23). Therefore, Connecticut Indemnity is entitled to summary judgment dismissing defendant Treanor's sixth and seventh counterclaim.

## POINT XI: TREANOR'S COUNTERCLAIM FOR CIVIL CONSPIRACY MUST BE DISMISSED

"A civil conspiracy is a combination of two or more parties joined for the purpose of injuring the plaintiff and thereby causing special damage." Peoples Federal Savings and Loan Ass'n of South Carolina v. Resources Planning Corp., 358 S.C. 460, 596 S.E.2d 51 (S.C. 2004). An unlawful act is not a necessary element of the tort. See Angus v. Burroughs & Chapin Co., 358 S.C. 498, 502, 596 S.E.2d 67 (S.C.App. 2004). A civil conspiracy is actionable only if overt acts pursuant to the conspiracy proximately cause damage to the plaintiff. See Pinion ex rel. Montague v. Pinion, 2005 WL 289065, *1 (S.C.App. 2005); Future Group, II v. Nationsbank, 324 S.C. 89, 100, 478 S.E.2d 45, 50-51 (1996). "A plaintiff cannot recover damages for a particular act or wrong and likewise recover on a conspiracy to do the act or wrong." Peoples Federal, 358 S.C. at 476, 596 S.E.2d 51. An action for civil conspiracy is an action at law; the trial judge's findings will be upheld on appeal unless they are without evidentiary support. Gynecology Clinic v. Cloer, 334 S.C. 555, 514 S.E.2d 592 (1999).

Here, there is no evidence to support this cause of action. Christi had no involvement in handling the claim or in Connecticut Indemnity's decision to deny the claim. (Ex. 1, McDowell

Tr. pp. 265-66; Ex. 3, Treanor Tr. pp. 286-87).  Accordingly, Connecticut Indemnity is entitled to summary judgment dismissing defendant Treanor's eighth counterclaim.

## CONCLUSION

For the foregoing reasons, The Connecticut Indemnity Company is entitled to a declaration that Yacht Policy No. YT 616342 is void _ab_ _initio_, and that, therefore, The Connecticut Indemnity Company has no obligation to indemnify Matthew Treanor for the total loss of the 60' Jim Smith.  In addition, The Connecticut Indemnity Company is entitled to summary judgment on each of defendant Treanor's counterclaims.

NICOLETTI HORNIG CAMPISE & SWEENEY

By:     s/ ROBERT A. NOVAK
ROBERT A. NOVAK (RN-7383)
Wall Street Plaza
88 Pine Street, 7th Floor
New York, New York  10005-1801
Telephone: (212) 220-3830
(FILE NO.: 21000120 JAVN/RAN)

and

BLUESTEIN LAW FIRM, P.A.
S. Scott Bluestein, Fed. Id. No.. 6891
145 King Street, Suite 311
Post Office Box 1248
Charleston, South Carolina 29402
Telephone:    (843) 577-3092

Attorneys for Plaintiff
THE CONNECTICUT INDEMNITY COMPANY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION
IN ADMIRALTY

THE CONNECTICUT INDEMNITY
COMPANY,

          Plaintiff,

    -vs-

MATTHEW TREANOR,

          Defendant,
------------------------------------------------------

MATTHEW TREANOR,

          Third-Party Plaintiff,

    -vs-

CHRISTI INSURANCE GROUP, INC.,

          Third-Party Defendant.
------------------------------------------------------

Civil Action No.: 2:04-2522-12

**AFFIDAVIT OF**
**ROBERT A. NOVAK, ESQ.**

STATE OF NEW YORK   )
                       s.s.
COUNTY OF NEW YORK  )

ROBERT A. NOVAK, being duly sworn, deposes and says:

1.    I am an attorney duly admitted to the practice of law in the State and Federal Courts of New York and before this Honorable Court pro hoc vice, and am a member of Nicoletti Hornig Campise and Sweeney, attorneys for plaintiff The Connecticut Indemnity Company ("Connecticut Indemnity"). The Nicoletti Hornig Campise & Sweeney firm, along with the Bluestein Law Firm, P.A., are attorneys of record for plaintiff Connecticut Indemnity in the captioned litigation.

2.     I am fully familiar with all the pleadings and proceedings in this action.

3.     This affidavit is submitted 1) in opposition to defendant "Matthew Treanor's Motion for Summary Judgment Against Connecticut Indemnity Company's Declaratory Judgment Action" and 2) in support of Connecticut Indemnity's cross-motion for summary judgment wherein Connecticut Indemnity seeks, inter alia, a declaration of non-liability under a marine insurance policy with respect to the claim made by Matthew Treanor for the total loss of an ocean going yacht on the grounds that Mr. Treanor misrepresented and/or failed to disclose facts material to the underwriting of the risk in violation of his duty of utmost good faith, thereby entitling Connecticut Indemnity to void ab initio the subject policy.

4.     The purpose of this affidavit is to place before the Court the relevant admissible evidence upon which Connecticut Indemnity's motion for summary judgment is based. In addition to the evidence attached hereto, Connecticut Indemnity is also submitting separately the Affidavits of Mr. John Sterling of Marine MGA, Inc. and Mr. Donald R. Roberts.

5.     Annexed hereto as Exhibit "1" are true and accurate copies of the relevant pages of the deposition testimony of Mr. Eric George McDowell, taken on June 27, 2005. Mr. McDowell is, and for approximately ten (10) years has been, employed as a producer for third-party defendant Christi Insurance Group, Inc. ("Christi"). (Ex. "1", pp. 5, 24-25).

6.     Annexed hereto as Exhibit "2" are true and accurate copies of the relevant pages of the deposition testimony of Mr. Herbert Wayne Abernathy, taken on May 20, 2005. Mr. Abernathy is a Florida yacht broker that, over a period of five (5) years, brokered the purchase and/or sale by Mr. Treanor of numerous yachts. (Ex. "2", pp. 4-6, 15-17).

7.     Annexed hereto as Exhibit "3" are true and accurate copies of the relevant pages of the deposition testimony of Mr. Matthew Treanor, taken on June 9, 2005.

8.     Annexed hereto as Exhibit "4" are true and accurate copies of the relevant pages of the deposition testimony of Mrs. Diane Myers, taken on June 22, 2005. Mrs. Myers is a Customer Service Representative for Brown & Brown Marine (formerly known as C.A. Hansen), a marine insurance broker in Florida. (Ex. "4", pp. 5, 11-15, 18-19).

9.     Annexed hereto as Exhibit "5" are true and accurate copies of the relevant pages of the deposition testimony of Mr. George Strickland. Mr. Strickland is the principal of Strickland Marine Insurance, Inc., a marine insurance brokerage located in Charleston, South Carolina. (Ex. "5", pp. 4, 6, 16-17, 20, 29).

10.     Annexed hereto as Exhibit "6" are true and accurate copies of the relevant pages of the deposition testimony of Captain Jay Swain. Captain Swain works as a local yacht Captain and served as a full time Captain for Matthew Treanor on the 53' Ocean SQUID ROW and the 60' Jim Smith SQUID ROW. (Ex. "6", pp. 4, 11-13, 17-18, 20-22, 25, 46-47).

11.     Annexed hereto as Exhibit "7" is a true and accurate copy of a letter dated January 13, 2004, with enclosures, from Mr. McDowell at Christi to Mr. Treanor, which was marked and identified as plaintiff's Exhibit 104 at the deposition of Mr. Treanor (Ex. "3", Treanor Tr. pp. 140-41) and which was referenced at the deposition of Mr. McDowell. (Ex. "1", McDowell Tr. pp. 248-50).

12.     Annexed hereto as Exhibit "8" is a true and accurate copy of the printout of pages of the web site for Mr. Treanor's charter company Squid Row Charters, L.L.C. which were identified and marked as plaintiff's Exhibit 51 at the deposition of Mr. Treanor. (Ex. "3", Treanor Tr. pp. 25-28).

13.     Annexed hereto as Exhibit "9" is a true and accurate copy of the printout of pages of a web site for Mr. Treanor's charter company Palmetto Charters and Yacht Services,

3

L.L.C. ("Palmetto Charters") which were identified and marked as plaintiff's Exhibit 55 at the deposition of Mr. Treanor. (Ex. "3", Treanor Tr. pp. 34-36).

14. Annexed hereto as Exhibit "10" is a true and accurate copy of the printout of pages of a web site for Mr. Treanor's charter company Palmetto Charters which were identified and marked as plaintiff's Exhibit 119 at the deposition of Mr. Treanor. (Ex. "3", Treanor Tr. p. 162).

15. Annexed hereto as composite Exhibit "11" are true and accurate copies of Palmetto Charter's "Charter Confirmations" for the sixty foot (60') Jim Smith that were identified and marked as plaintiff's Exhibits 125, 126, 127, 128, 129, 130, 131 and 132 at the deposition of Matthew Treanor. (Ex. "3", Treanor Tr. pp. 184-193).

16. Annexed hereto as Exhibit "12" is a true and accurate copy of a "2005 Saltwater Charter Vessel Permit Renewal" from the South Carolina Department of Natural Resources for the sixty foot (60') Jim Smith which was identified and marked as plaintiff's Exhibit 134 at the deposition of Matthew Treanor (Ex. "3", Treanor Tr. pp. 195-196).

17. Annexed hereto as Exhibit "13" is a true and accurate copy of a correspondence from Mrs. Myers of C.A. Hansen to Mr. Treanor with enclosures, dated February 15, 2002, relating to endorsements deleting a 1988 48' Hatteras SQUID ROW from coverage and adding a 1997 53' Ocean SQUID ROW to coverage which was marked and identified at the deposition of Matthew Treanor as plaintiff's Exhibit 76 (Ex. "3", Treanor Tr. pp. 65-69) and referenced in the deposition of Mrs. Myers. (Ex. "4", Myers Tr. p. 60). Mrs. Myers further testified that the C.A. Hansen documents were business records of C.A. Hansen. (Ex. "4", Myers Tr. pp. 124-125).

18. Annexed hereto as Exhibit "14" is a true and accurate copy of a correspondence from Mrs. Myers of C.A. Hansen to Mr. Treanor, dated June 27, 2001, relating

4

to charter coverage for a yacht Treanor was purchasing named "KORINA VICTORIA" which was identified and marked as plaintiff's Exhibit 64 at the deposition of Matthew Treanor (Ex. "3", Treanor Tr. pp. 45-46) and referenced at the deposition of Mrs. Myers. (Ex. "4", Myers Tr. pp. 52-54).

19. Annexed hereto as Exhibit "15" is a true and accurate copy of the C.A. Hansen Yacht Insurance Application, dated March 6, 2000, which was identified and marked as plaintiff's Exhibit 65 at the deposition of Mr. Treanor (Ex. "3", Treanor Tr. pp. 46-48) and referenced at the deposition of Mrs. Myers. (Ex. "4", Myers Tr. pp. 44-45).

20. Annexed hereto as Exhibit "16" is a true and accurate copy of a fax, dated March 3, 2000, from C.A. Hansen to Matthew Treanor concerning the confirmation of marine insurance coverage, which was identified and marked as plaintiff's Exhibit 66 at the deposition of Mr. Treanor (Ex. "3", Treanor Tr. pp. 49-50) and referenced at the deposition of Mrs. Myers. (Ex. "4", Myers, Tr. pp. 40-43).

21. Annexed hereto as Exhibit "17" is a true and accurate copy of the Yacht Insurance Application, dated January 24, 2002, which was identified and marked as plaintiff's Exhibit 74 at the deposition of Mr. Treanor (Ex. "3", Treanor Tr. pp. 60-61) and referenced at the deposition of Mrs. Myers. (Ex. "4", Myers Tr. pp. 56-57).

22. Annexed hereto as Exhibit "18" is a true and accurate copy of a letter, dated January 29, 2002, from Diane Myers at C.A. Hansen to Matthew Treanor, which was identified and marked as plaintiff's Exhibit 75 at the deposition of Mr. Treanor. (Ex. "3", Treanor, Tr. pp. 64-65).

23. Annexed hereto as Exhibit "19" is a true and accurate copy of a series of e-mails between C.A. Hansen and ACE/INAMAR regarding ACE/INAMAR's refusal to quote coverage for the 60' Jim Smith which was marked and identified as plaintiff's Exhibit 174 at the

5

deposition of Mrs. Myers. (Ex. 4, Myers Tr. pp. 82-83). Mrs. Myers further testified that the C.A. Hansen documents were business records of C.A. Hansen. (Ex. "4", Myers Tr. pp. 124-125).

      24.    Annexed hereto as Exhibit "20" is a true and accurate copy of a C.A. Hansen quote request intake sheet, dated September 17, 2003, which was identified and marked as plaintiff's Exhibit 87 at the deposition of Mr. Treanor (Ex. "3", Treanor Tr. pp. 87-89) and referenced at the deposition of Mrs. Myers. (Ex. "4", Myers Tr. pp. 72-74).

      25.    Annexed hereto as Exhibit "21" is a true and accurate copy of an Application for Yacht Insurance, dated September 18, 2003, which was identified and marked as plaintiff's Exhibit 88 at the deposition of Mr. Treanor (Ex. "3", Treanor Tr. pp. 89-92) and referenced at the deposition of Mrs. Myers. (Ex. "4", Myers Tr. pp. 114-116).

      26.    Annexed hereto as Exhibit "22" is a true and accurate copy of the Yacht Insurance Quotation, dated September 22, 2003, which was identified and marked as plaintiff's Exhibit 89 at the deposition of Mr. Treanor (Ex. "3", Treanor Tr. pp. 92-94) and referenced at the deposition of Mrs. Myers. (Ex. "4", Myers Tr. pp. 78-80).

      27.    Annexed hereto as Exhibit "23" is a true and accurate copy of a letter, dated October 2, 2003, from C.A. Hansen to Matthew Treanor with attached Marine Insurance Confirmation and Yacht Insurance Application which was identified and marked as plaintiff's Exhibit 92 at the deposition of Mr. Treanor (Ex. "3", Treanor Tr. pp. 104-105) and referenced at the deposition of Mrs. Myers. (Ex. "4", Myers Tr. pp. 89-91).

      28.    Annexed hereto as Exhibit "24" is a true and accurate copy of a Memo, dated October 10, 2003, from Matthew Treanor to C.A. Hansen, which was identified and marked as plaintiff's Exhibit 84 at the deposition of Mr. Treanor (Ex. "3", Treanor Tr. p. 80) and referenced at the deposition of Mrs. Myers. (Ex. "4", Myers Tr. pp. 92-94).

29. Annexed hereto as Exhibit "25" is a true and accurate copy of La Reunion Francaise S.A. v. Thomson, 1999 WL 1293470 (S.D. Fla. 1999).

30. Annexed hereto as Exhibit "26" is a true and accurate copy of an unpublished decision of the United States Court of Appeals for the Eleventh Circuit entitled La Reunion Francaise S.A. v. Thomson, No. 99-13053, dated January 17, 2001.

31. Annexed hereto as Exhibit "27" is a true and accurate copy of an unpublished decision of the United States Court of Appeals for the Eleventh Circuit entitled La Reunion Francaise S.A. v. Thomson, No. 01-17204, dated September 10, 2002.

32. Annexed hereto as Exhibit "28" is a true and accurate copy of a Marine Insurance Application signed by defendant Treanor in October, 2004 regarding a 1969 60' Pacemaker vessel, which was identified and marked as plaintiff's Exhibit 32 at the deposition of Mr. George Strickland. (Ex. "5", Strickland Tr. pp. 81-83).

33. Annexed hereto as Exhibit "29" is a true and accurate copy of a cover letter and Marine Insurance Application signed by defendant Treanor on September 27, 2004 regarding a 1999 21' Mako vessel, which was identified and marked as plaintiff's Exhibit 44 at the deposition of Mr. George Strickland (Ex. "5", Strickland Tr. pp. 154-55) and which was referenced at the deposition of Matthew Treanor. (Ex. "3", Treanor Tr. pp. 199-200).

_____
ROBERT A. NOVAK

Sworn to before me this
8th day of August, 2005

_____
Notary Public

MICHELLE MANISCALCO
Notary Public, State of New York
No. 01MA6088438
Qualified in Kings County
Certificate Filed in New York County
Commission Expires March 3, 20__

X:\Public Word Files\21\12D\LEGAL\AFFIDAVIT OF ROBERT NOVAK 8 8 05 mm.doc

7

THE CONNECTICUT INDEMNITY
COMPANY,

        Plaintiff,

-against-

MATTHEW TREANOR,

        Defendant,

MATTHEW TREANOR,

        Third-Party Plaintiff,

    - against -

CHRISTI INSURANCE GROUP, INC.

        Third-Party Defendant.

Civil Action No.: 2:04 2522 12

**PLAINTIFF THE CONNECTICUT INDEMNITY COMPANY'S CROSS-MOTION FOR SUMMARY JUDGMENT**

**NOW INTO COURT**, through the undersigned counsel, comes Plaintiff, The Connecticut Indemnity Company ("Connecticut Indemnity"), and moves this Honorable Court to grant it summary judgment on its declaratory judgment complaint on the grounds that defendant made misrepresentations of material facts in his application for marine insurance, thereby rendering the resulting marine insurance policy void ab initio. Plaintiff also seeks summary judgment on defendant Matthew Treanor's first counterclaim for bad faith and on each of defendant's third through eighth counterclaims. The grounds for summary judgment on defendant Matthew Treanor's first counterclaim for bad faith is that the undisputed

1

evidence establishes that it had reasonable grounds to contest the claim. Thus, as a matter of law, defendant Matthew Treanor cannot sustain his burden of proving that there was no reasonable basis to support the insurer's decision.

Summary judgment is also warranted on each of defendant Matthew Treanor's third through eighth counterclaims on the grounds that no facts exist upon which defendant can sustain his burden of proving the necessary elements of each respective counterclaim. Additional grounds for granting Connecticut Indemnity summary judgment are more fully set forth in the attached Memorandum of Law in Opposition to Defendant Matthew Treanor's Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion for Summary Judgment.

BLUESTEIN LAW FIRM, P.A.

By: S/S. Scott Bluestein
S. Scott Bluestein, Fed. Id. No. 6891
145 King Street, Suite 311
Post Office Box 1248
Charleston, South Carolina 29402
Telephone: (843) 577-3092

- and -

NICOLETTI HORNIG CAMPISE SWEENEY & PAIGE

Robert A. Novak
Wall Street Plaza
88 Pine Street, 7th Floor
New York, New York 10005-1801
(212) 220-3830

Attorneys for Plaintiff,

THE CONNECTICUT INDEMNITY COMPANY

Charleston, South Carolina

August 8, 2005